UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RODNEY LESTER, | |
| Plaintiff, | Case No. 17-cv-1772 |
| v. | |
| PETER O'ROURKE, Acting Secretary of Veterans Affairs,[1] | Judge John Robert Blakey |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rodney Lester sued his former employer, the Department of Veterans Affairs (VA), alleging that it unlawfully discriminated and retaliated against him because of his race and age. Defendant moved for summary judgment. For the reasons explained below, this Court partially grants the motion.

### I.  Background

The facts come from Defendant's Local Rule 56.1 statement of facts [29] and Plaintiff's statement of additional facts [34].

#### A.  Declarations as Evidence

Many of Plaintiff's facts rely—at least in part—upon signed and dated declarations from Plaintiff and Thomas Johnson, one of Plaintiff's union representatives. *See* [34-1] at 2–12. Declarations may substitute for affidavits and

---

[1] Peter O'Rourke became the Acting Secretary of Veterans Affairs in May 2018 and thus substituted for David Shulkin as a party pursuant to Federal Rule of Civil Procedure 25(d).

1

constitute evidence if they comply with 27 U.S.C. § 1746, which requires a dated signature. *See Sheikh v. Grant Reg'l Health Ctr.*, 769 F.3d 549, 551 (7th Cir. 2014). The Seventh Circuit has "repeatedly emphasized" that parties may not use the term "self-serving" to "denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgement." *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013). As long as a competent declarant makes statements based upon personal knowledge, the declaration can support a summary judgment motion. *Id.* at 968; *see also* Fed. R. Civ. P. 56(c)(4). In short, Plaintiff and Johnson's declarations constitute admissible evidence at this point in the proceedings.

Yet in response to every paragraph in Plaintiff's statement of additional facts that cites one of the declarations, Defendant states a variation of the following: "Deny that [Plaintiff's] allegations are supported by any evidence other than his own testimony and declaration and Thomas Johnson's declaration." *See, e.g.*, [35] at 3. Apparently, these purported denials indicate that Defendant believes that Plaintiff and Johnson's declarations, for whatever unspecified reason, do not constitute evidence. But as this Court explained above, Plaintiff may use those declarations as evidence to oppose the motion. Defendant's improper denials fail to controvert Plaintiff's facts, so for present purposes, this Court deems admitted any fact that Defendant denied solely by objecting to one of the declarations. *See* N.D. Ill. L.R. 56.1(a); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

### B. Plaintiff's Disciplinary History and EEO Complaints

Plaintiff, a 60-year-old African-American man, worked for the VA in various jobs from 1979 to 2011. [34] at 10; [29] ¶ 3. In 1992, Plaintiff joined the IT Department at the VA's Edward Hines, Jr. Hospital as an electronics technician. [29] ¶ 6. At some unspecified point, the VA promoted Plaintiff to the position of computer electrician at Hines. *Id.* ¶ 8. Gordon Brown, a Caucasian man, worked as the Chief Information Officer at Hines and served as Plaintiff's second line supervisor, but never his direct supervisor. *Id.* ¶ 9.

From 2005 to 2009, Defendant disciplined Plaintiff multiple times (with written reprimands and sometimes suspensions as long as 14 days) for performance and conduct issues, including unauthorized absences and failing to follow instructions. *Id.* ¶ 10. Plaintiff filed EEO claims against the VA for each instance of discipline and disputes the legitimacy of the disciplinary measures. [34] at 2. In December 2009, Brown sent Plaintiff three "letters of inquiry" about his continued performance and conduct issues. [29] ¶ 11. Plaintiff contends that Brown sent the letters and ordered the previous suspensions because Plaintiff filed EEO complaints about Brown. [34] at 2, 12. Plaintiff's earlier EEO complaints alleged that Brown racially discriminated and retaliated against him. *See, e.g., id.* at 11–12.

Between November 2009 and February 2010, Plaintiff and Defendant participated in several mediation sessions regarding one of Plaintiff's EEO complaints. *Id.* at 12. Various union representatives, including Johnson, represented Plaintiff throughout the mediation. *Id.* at 13. At one session, a VA

3

officer named Jeff Fears suggested that Plaintiff transfer to a different facility, the Jesse Brown VA Medical Center, because Plaintiff claimed that Brown "was going after him." *Id.* at 12; [35] at 7.

While mediation continued, Brown sent Plaintiff a notice of proposed removal in February 2010. [29] ¶ 12. The notice charged Plaintiff with, among other things, failing to complete work on time and behaving inappropriately at work. *Id.* Again, Plaintiff filed EEO claims against the VA for each instance of discipline and suggests that Brown disciplined him for illegitimate reasons. [34] at 3.

After Plaintiff received Brown's notice of proposed removal, Johnson emailed Fears and asked him to stay a decision on Plaintiff's removal until he knew the outcome of Plaintiff's mediation. *Id.* at 13. Johnson suggested the stay because the mediation might have resulted in removing the suspensions from Plaintiff's record, which would have meant that Defendant could not use those suspensions as an "aggravating factor" to fire Plaintiff. *Id.*

Plaintiff, Johnson, and Fears met for an unsuccessful mediation session in March 2010, during which Fears refused to discuss Plaintiff's pending EEO complaint or proposed removal. *Id.* They met again in May 2010 with an EEO representative present, and Fears again refused to discuss Plaintiff's pending EEO complaint. *Id.* Instead, Defendant offered Plaintiff a "Last Chance Agreement."

### C. The Last Chance Agreement (LCA)

As the name suggests, Plaintiff had a choice between signing the LCA and losing his job. *Id.* He signed the agreement (although not until September 2010).

4

[29] ¶ 14. Per the LCA, Defendant agreed to hold Plaintiff's removal in abeyance for ten months, remove certain discipline-related documents from his file, and transfer him to another facility. *Id.* ¶ 16. Plaintiff agreed that Defendant had sufficient evidence supporting the charges against him to justify his removal, and agreed to "maintain satisfactory conduct and work habits" and be respectful of VA employees, patients, and visitors. *Id.*

The LCA also required Plaintiff to voluntarily dismiss his pending EEO complaints and waive his right to seek relief with the EEOC or a United States district court under federal employment statutes if Defendant disciplined or terminated him pursuant to the LCA. [34] at 13–14. Johnson stated in his declaration that Defendant often uses LCAs for employees with EEO claims to force them to relinquish their claims, "even in cases where there is no valid reason to remove the employee." *Id.* at 13; [34-1] at 10. Johnson also indicated that LCAs are "a trap" for employees, and that Defendant fires most employees on LCAs shortly after they sign the agreements. [34-1] at 11. Before signing the LCA, Plaintiff protested the provision that required him to voluntarily dismiss his pending EEO complaints. [34] at 13.

**D. Plaintiff's Time at Tomah and Termination**

Pursuant to the LCA, Defendant transferred Plaintiff to the Jesse Brown VA Medical Center in September 2010 and assigned him to the help desk operating out of the VA's Tomah, Wisconsin facility. [29] ¶ 17. Shortly before the transfer, Fears called Chad Babcock, Tomah's Chief Information Officer, to tell him about

5

Plaintiff's impending move; Fears asked Babcock to monitor Plaintiff and report to Fears if he caused issues. *Id.* ¶ 18. Although Babcock knew that Plaintiff's transfer resulted from a "Last Chance Agreement," he did not know that Plaintiff had filed EEO complaints. *Id.* Babcock never spoke to Brown about Plaintiff. *Id.*

For most of Plaintiff's time at Tomah, Amy Deschane served as the help desk's team leader. *Id.* ¶ 19. Deschane likewise did not know that Plaintiff had filed EEO complaints. *Id.* She testified that she did not know about the LCA until after Plaintiff's termination, *id.*, although Plaintiff suggests that a computer file she created on July 13, 2011—one week before Defendant fired Plaintiff—called "LCA Information" indicates otherwise, [34] at 5. Deschane testified that she never met Brown in person or spoke with him on the phone; their only communication about Plaintiff happened through email when, on one occasion, Brown forwarded her a help desk complaint from Hines about Plaintiff. [29] ¶ 19. Brown commonly sent Deschane such emails about help desk issues with other employees. *Id.* Plaintiff speculates that Brown and Deschane would have met at a higher-level VA meeting in Milwaukee, Wisconsin, [34] at 5, but Deschane testified that she never attended the Milwaukee meeting that Plaintiff referenced, [29-6] at 26.

Plaintiff does not dispute that he had no further contact with Brown after transferring to Tomah. [29] ¶ 20. After Plaintiff left Hines, Brown sent two emails about him: one to Deschane, discussed above, and one to Babcock asking when Plaintiff would switch to the Tomah system. *Id.*

Although Plaintiff remained in essentially the same position when he

6

transferred to Tomah, he received additional on-the-job training there. *Id.* ¶ 22. The parties agree that Plaintiff "did fine" for his first few months at Tomah. *Id.* ¶ 23. But by early 2011, Babcock and Deschane said they regularly received complaints from VA staff that Plaintiff could not solve their problems and did not follow proper procedures for handling and logging calls. *Id.* Plaintiff also regularly took long breaks. *Id.* Deschane emailed or messaged Plaintiff each time she received a complaint about him or noticed an issue with his work; she also notified Babcock and another supervisor about any issues, which her job required her to do. *Id.* ¶ 24. Plaintiff contends that Deschane supervised him too closely. [34] at 6.

In Defendant's view, Plaintiff's job performance never improved once it took a turn for the worse. [29] ¶ 25. By June 2011, Babcock sent Plaintiff a letter asking him to explain multiple problems that "indicated a serious degradation" in his job performance over the last few months. *Id.* ¶ 27. Plaintiff said he responded and told Babcock that the complaints about his work "were false." [34] at 7.

Ultimately, Fears fired Plaintiff in July 2011, citing violations of the LCA's performance requirements. [29] ¶ 28. Fears reviewed Plaintiff's file before firing him and had conversations with Babcock and staff from Human Resources about Plaintiff. *Id.* ¶ 37. The termination letter gave specific examples of how Plaintiff violated the LCA. *Id.* Plaintiff contends that Fears fired him for conduct that would not have gotten his coworkers fired. [34] at 15.

## II. Legal Standard

Courts should grant summary judgment when the moving party shows that

no genuine dispute exists as to any material fact and the evidence weighs so heavily in the moving party's favor that the moving party "must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also* Fed. R. Civ. P. 56. A genuine dispute as to a material fact exists when, based upon the evidence, a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 248. To show a genuine dispute as to a material fact, the non-moving party must point to "particular materials in the record," and cannot rely upon the pleadings or speculation. *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014).

At summary judgment, courts must evaluate evidence in the light most favorable to the non-moving party and refrain from making credibility determinations or weighing evidence. *Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017) (citing *Anderson*, 477 U.S. at 255). The moving party bears the burden of establishing the lack of genuine disputes as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### III. Analysis

#### A. Count I: Title VII Retaliation

Count I alleges that Defendant violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, by forcing Plaintiff to waive any future Title VII claims through the LCA and by firing him because he filed EEO charges. [9] ¶¶ 36–40. Defendant argues that this claim fails because it fired Plaintiff for poor performance. [28] at 1.

To succeed on a Title VII retaliation claim, a plaintiff must show that his

employer took a materially adverse action against him because he engaged in statutorily protected activity. *See Freelain v. Village of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018). In the retaliation context, a materially adverse action means something that "'would have dissuaded a reasonable worker from' engaging in protected activity." *Id.* at 901–02 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The parties do not dispute that Plaintiff engaged in statutorily protected activity by filing numerous EEO charges. *See, e.g.*, [29] ¶ 30; [34] at 12.

### 1. LCA

In this case, this Court must consider whether the LCA itself constituted a materially adverse action because of its Title VII claim-waiver provision. This Court finds persuasive the Central District of Illinois' decision in *E.E.O.C. v. Cognis Corp.*, No. 10-cv-2182, 2011 WL 6149819 (C.D. Ill. Dec. 12, 2011), and answers the question affirmatively.

The LCA contains two claim-waiver provisions. The first required Plaintiff to "withdraw with prejudice" all pending EEO complaints that he made "prior to the execution of this Agreement." [34-1] at 96 (§ 7d). The second required Plaintiff to "waive all rights he may have," including but not limited to "those under Title V and Title VII of the US Code for any action" in connection with the Agreement. *Id.* at 98 (§ 9b). Section 9b also expressly waived Plaintiff's right to file any action with, among others, the EEOC, Illinois state courts, and federal district courts. *Id.*

Section 7d represents a standard component of settlement agreements:

9

waiving *existing* claims as consideration for receiving something valuable in return (in this case, Plaintiff kept his job). *See, e.g.*, *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 793 (7th Cir. 2005). But section 9b moves far beyond that traditional arrangement by requiring Plaintiff to waive all rights for any *future* Title VII claims potentially arising out of future discipline or termination. In other words, Defendant threatened to fire Plaintiff unless he surrendered all of his rights under Title VII in response to future discriminatory conduct. *See* [34-1] at 98.

The *Cognis* court addressed a provision similar to section 9b and found that, although Title VII's language does not explicitly prohibit preemptive threats of retaliation, such contract provisions fall within the purview of Title VII's anti-retaliation provision. 2011 WL 6149819, at *7. Because the anti-retaliation provision exists primarily to maintain "unfettered access to statutory remedial mechanisms," some kinds of threatened retaliation—including the claim-waiver provision at issue here—must be actionable under Title VII. *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)). And the Seventh Circuit previously acknowledged in dicta that evidence that an employer "threatened the plaintiff with firing her if she sued" would constitute "anticipatory retaliation, actionable as retaliation under Title VII." *Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 624 (7th Cir. 2002).

Fundamentally, returning to the Supreme Court's definition of "materially adverse action," threatening to fire an employee based upon possible lawsuits against the employer for any future discriminatory conduct undoubtedly "would

10

have dissuaded a reasonable worker" from engaging in such protected activity. *Cognis*, 2011 WL 6149819, at *8 (quoting *Burlington*, 548 U.S. at 68).

Thus, this Court finds that the LCA constituted a materially adverse employment action because it required Plaintiff to waive his right to file any future Title VII claims in order to keep his job. *See Sauers v. Salt Lake County*, 1 F.3d 1122, 1128 (10th Cir. 1993) ("Action taken against an individual in anticipation of that person engaging in protected opposition to discrimination is no less retaliatory than action taken after the fact."); *Johnson v. ITT Aerospace*, 272 F.3d 498, 500–01 (7th Cir. 2001) (citing *Sauers'* "preemptive retaliation" idea with approval in response to a hypothetical about an employer that "deliberately strewed unreasonable obstacles in the path of employees seeking to enforce their rights under Title VII"); *cf. Atkinson v. UA Airlines*, No. 14-cv-10367, 2017 WL 36443, at *9 (N.D. Ill. Jan. 4, 2017) (distinguishing *Cognis* on its facts because UA Airlines "never framed the possibility of termination as a threatened consequence for Atkinson's failure to sign the LCA").

A second question now remains: whether Defendant had Plaintiff sign the LCA because Plaintiff filed EEO complaints. Plaintiff provides evidence suggesting that Defendant did just that. Johnson, in his experience as a union representative, observed that Defendant often uses LCAs to force employees to relinquish their EEO claims "even in cases where there is no valid reason to remove the employee." [34-1] at 10. And Fears' behavior at the mediation sessions that occurred just before Defendant offered Plaintiff the LCA—refusing to discuss Plaintiff's EEO

complaints even though mediation of those complaints had been ongoing for months—could indicate that he had grown frustrated with Plaintiff's protected activity and wanted to find a way to make Plaintiff stop complaining. *See Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (explaining the types of circumstantial evidence that Title VII plaintiffs may rely upon).

Defendant did not address *Cognis* in its reply, and mainly argues that Plaintiff's retaliation claim fails because, taking the evidence as a whole, he cannot establish a prima facie case of retaliation and cannot show that Defendant's reasons for firing Plaintiff were pretextual. *See generally* [36]. Defendant misunderstands how the Seventh Circuit's decision in *Ortiz v. Werner Enterprises*, 834 F.3d 760 (7th Cir. 2016), modified the analysis in employment discrimination cases. After *Ortiz*, Plaintiff may survive summary judgment if a review of the evidence as a whole indicates that a reasonable jury could find that a proscribed factor caused the adverse employment action. *See David v. Bd. of Trs. of Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).[2] Thus, Plaintiff does not have to make out a prima facie case or

---

[2] Even though *McDonnell Douglas*, 411 U.S. 792 (1973) still provides the overall burden-shifting framework for employment discrimination claims, *see* 411 U.S. at 802–04, appellate courts retain some discretion to specify the means of proof, *see, e.g.*, *Lindsay v. Yates*, 578 F.3d 407, 415–16 (6th Cir. 2009) (discussing variations in the *McDonnell Douglas* prima facie case depending upon the type of claim asserted). Thus, the Seventh Circuit permissibly overturned its own precedent when it reshaped the inquiry as to a plaintiff's prima facie case in *Ortiz*. *See* 834 F.3d at 765–66. Rejecting its own earlier approach (but remaining totally consistent with *McDonnell Douglas*), the Seventh Circuit instructed courts to ask simply "whether the evidence would permit a reasonable factfinder to conclude" that a "proscribed factor" caused the adverse employment action. *Ortiz*, 834 F.3d at 765. Indeed, the court could hardly have been clearer in its intent to eliminate the "blurred" distinction between the direct and indirect methods of proof. *Ortiz*, 834 F.3d at 765 ("Why have two tests if they consider the same information and answer the same question?"). The *Ortiz* court expressly noted that its decision affected the Seventh Circuit's "indirect method" of establishing a prima facie case, *not* the burden-shifting framework as a whole (as it was not, of course, within the appellate court's power to overturn a framework established by the Supreme Court). *See id.* at 766.

show that Defendant's explanations were pretextual if he can make his case under *Ortiz's* holistic approach.

Because genuine issues of material fact remain regarding whether Defendant offered Plaintiff the LCA because he engaged in statutorily protected activity, this Court denies summary judgment for Defendant as to the LCA portion of Count I.[3]

### 2. Termination

Turning to Plaintiff's termination, that undoubtedly qualifies as a materially adverse action. *See Burlington*, 548 U.S. at 64.

And as with the LCA, genuine issues of material fact exist regarding whether Defendant fired Plaintiff because he engaged in statutorily protected activity. Here, Defendant provides evidence—from Babcock, Deschane, and Fears' testimony—that it fired Plaintiff because he performed poorly at his job, not because he filed EEO charges. *See, e.g.*, [29] ¶¶ 22–24. But Plaintiff provided handwritten notes of his call logs at Tomah that contradict some of Defendant's examples of calls he handled poorly, *see* [34-1] at 181, and he provided a June 2011 email from Tomah's SPD Department to Babcock calling Plaintiff a "miracle worker" and praising his work on the help desk, [34-1] at 287. Also, Babcock testified that no other employees had been fired for not entering help desk tickets, [29-2] at 14, even though Fears cited Plaintiff's 4.5 hour delay in entering a ticket as one of the reasons justifying

---

[3] Based upon the record before this Court, Plaintiff did not file a separate EEO charge for the LCA (understandably, given its terms). Although Title VII plaintiffs ordinarily may only pursue claims in federal court that they first brought to the EEOC's attention, the Seventh Circuit holds that "a plaintiff who alleges retaliation for having filed a charge with the EEOC need not file a second EEOC charge to sue for that retaliation." *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1030 (7th Cir. 2013). Plaintiff's situation falls within that carve-out.

13

Plaintiff's termination, [34] at 14–15. Coupled with Johnson's testimony that Defendant used LCAs as "a trap" and almost always fired employees who signed LCAs, [34-1] at 11, and the evidence suggesting Fears' frustration with Plaintiff's EEO complaints and his instructions to Babcock to "monitor" Plaintiff, [29] ¶ 18, the circumstantial evidence could permit a reasonable factfinder to conclude that Defendant fired Plaintiff because he filed EEO complaints. *See Ortiz*, 834 F.3d at 765. Thus, this Court denies summary judgment to Defendant on Count I.

### B. Count II: Hostile Work Environment

Count II alleges that Defendant permitted a hostile work environment for Plaintiff in violation of Title VII. [29] ¶¶ 41–45. Defendant argues that this claim fails because Plaintiff cannot show that he endured such severe or pervasive harassment that it created the requisite "hellish" work environment. [28] at 16–17.

Plaintiff makes no effort to defend Count II in his response brief, s*ee generally* [33], and thus waives the claim, *see Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016). Even if Plaintiff had defended this claim, no reasonable jury could conclude that he endured a legally "hellish" environment based upon the present record. As such, this Court grants summary judgment to Defendant on Count II.

### C. Count III: Race Discrimination

Count III alleges that Defendant discriminated against Plaintiff because of his race in violation of Title VII. [29] ¶¶ 46–48. Defendant argues that this claim fails because Plaintiff has offered no evidence that even suggests an improper racial motive for his termination. [28] at 1.

14

To succeed on a Title VII race discrimination claim, a plaintiff must show that his employer took an adverse employment action against him because of his race. *Ortiz*, 834 F.3d at 765. Plaintiff does not argue that any event except his termination qualifies as an adverse action for Count III. *See generally* [33].

This claim fails because Plaintiff provides no evidence that suggests a racial animus for firing him. Indeed, with the exception of Plaintiff's race and Brown's race, the record lacks any information about the race of Plaintiff's supervisors or coworkers. Although Plaintiff and Brown undoubtedly had a contentious history, Plaintiff admits that he had no contact with Brown after transferring to Tomah, [29] ¶ 20, and he offers no evidence to suggest that Brown played any role in firing him. Thus, Brown's race has nothing to do with this claim.

Even assuming Defendant would not have fired Plaintiff's coworkers for the same reasons it fired Plaintiff, as he argues, that fact has no significance without some context about Plaintiff's coworkers. If, for example, all of Plaintiff's coworkers were also African-American, then preferential treatment for his coworkers would not indicate racial animus. Likewise, the record contains no evidence that, for example, Plaintiff's supervisors (besides Brown, possibly) or coworkers used racial slurs against him or expressed any dislike for African-Americans. Johnson said that many African-American employees call Hines (Plaintiff's original work site) "The Plantation" because of its long history of racial discrimination and retaliation, [34-1] at 9, but such a general statement cannot by itself create a genuine issue of material fact about the motivation for Plaintiff's termination at Tomah. *Cf.*

*Henderson v. Shulkin*, 720 F. App'x 776, 784 (7th Cir. 2017) (circumstantial evidence of animus toward black employees included supervisor saying he wanted "to keep it Black and White," evidence that supervisor disciplined black employees more harshly than white employees, and evidence that no black members of the work group had supervisory authority).

Because Plaintiff fails to connect his July 2011 termination to his race, either directly or circumstantially, this Court grants summary judgment to Defendant on Count III. *See Celotex*, 477 U.S. at 322 (Rule 56 mandates entering summary judgment against a party who fails to establish an element for which that party will bear the burden of proof at trial).

### D. Count IV: Age Discrimination

Count IV alleges that Defendant discriminated against Plaintiff because of his age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.* [29] ¶¶ 49–51. Defendant argues that this claim fails because Plaintiff did not file it timely. [28] at 8. Plaintiff offers no argument supporting this claim in his response brief, s*ee generally* [33], and thus waives the claim, *see Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016). This Court grants summary judgment to Defendant on Count IV.

## IV. Conclusion

This Court partially grants and partially denies Defendant's motion for summary judgment [27]. This Court grants the motion as to Counts II, III, and IV, and denies it as to Count I. The July 12, 2018 motion hearing stands, but as a

status hearing. All other dates and deadlines stand. The Clerk shall update the caption to reflect Peter O'Rourke as a party in place of David Shulkin.

Dated: June 27, 2018

Entered:

_____
John Robert Blakey
United States District Judge